MCDANIEL BROTHERS CONSTRUCTION COMPANY *v.* MID-STATE CONSTRUCTION CO.

5-5971 482 S.W. 2d 825

Opinion delivered July 24, 1972

1224

*J. Winston Bryant* and *Wendell O. Epperson,* for appellant.

*Joe W. McCoy,* for appellee.

JOHN A. FOGLEMAN, Justice. Mid-State Construction Company sued McDaniel Brothers to recover $22,900.87 for dirt hauled to three housing project sites in Malvern, alleging that this balance was due on an oral contract. McDaniel Brothers denied owing Mid-State any balance and counterclaimed, seeking damages amounting to $10,-215 for breach of contract. The jury's verdict on interrogatories resulted in a judgment of $12,500 in favor of Mid-State.

Appellant[1] lists the following points for reversal:

I. The jury's verdict in the amount of $12,500.00 in favor of the appellee is excessive and there is no substantial evidence on which the amount allowed could have been properly awarded by the jury.

II. The trial court erred in submitting special interrogatories Nos. 1 and 2 to the jury. The interrogatories were misleading in that they did not contain all of the elements of the contract and in addition, included controverted facts, which had the effect of misleading the jury.

III. The trial court erred in submitting plaintiff's requested instruction No. 4, in that the instruction was misleading and does not conform to the applicable law regarding contracts.

Since Point II requires a discussion of the terms of the contract, we shall consider that contention first.

These are the interrogatories on which appellant's Point II is based:

Do you find from a preponderance of the evidence that the Plaintiff, Mid-State Construction Company, only agreed or contracted with Defendant, McDaniel Brothers Construction Company, to clear and grub the three sites and to haul in fill dirt, level and compact the same to grade (blue top) on said sites? Answer: yes or no.

Do you find from a preponderance of the evidence that the Plaintiff, Mid-State Construction Company, in

---

[1]While McDaniel Brothers Construction Company is a partnership, we will refer to the McDaniels as "appellant."

addition to its contract to clear and grub the three sites, haul in fill dirt, level and compact the same to grade (blue top); further agreed to haul in top soil, spread and fine grade the same on three sites? Answer: yes or no.

Appellant's objection to both interrogatories was fundamentally the same, i.e., that both were misleading because neither incorporated all the elements of the contract between the parties. Appellants now argue that these interrogatories are broken down in such a way as to indicate that there were two separate contracts between the parties or, in the alternative, only part of the contract might have been entered into by the parties, so that the jury was misled into giving a negative answer to an interrogatory whether Mid-State abandoned or refused to complete its contract.

The basic issue in the case was the extent of the work contracted. McDaniel Brothers contended that Mid-State contracted to clear and grub the sites where the buildings were being contructed by Mid-State, bring fill dirt to the sites and compact it to grade, and then haul in and spread a "fine grade" top soil.

The evidence as to the terms of the contract was very conflicting and confusing, to say the least. The original negotiations were conducted between M. B. (Rip) Evans, then a construction superintendent for appellee, and George Anderson, an engineer employed by appellant. Evans also had some conversation about the matter with J. B. Jones, McDaniel's construction superintendent. At the time of the trial, both Evans and Jones had left these employers. Evans seems to have been operating a separate business of his own throughout, and he testified that he had gone to work for Jones. There was at least an inference that he was or had been working for McDaniel. On cross-examination he said he was trying to be fair about the matter, and wanted to stay neutral.

Sam R. Clark, president of appellee, testified that his company agreed to haul in select material for topsoil

at $1.25 per cubic yard if it would meet specifications of appellant, but that McDaniel Brothers' superintendent stopped appellee from hauling this material because he did not want to use it. The testimony about the superintendent's stopping the hauling is not denied. Calrk admitted that Evans negotiated the contract with appellant, acting only on Clark's instructions, and that the contract was oral in its entirety. He stated that Evans had no authority to enter into a contract, and that all contracts of his company had to be approved by him as president.

Doswell McDaniel, a partner in McDaniel Brothers Construction Company, said that Evans' first offer was made to Anderson and did not include topsoil. He said that he and Evans later agreed orally on a contract for fill dirt at $1.15 per cubic yard and select material at $1.25 per yard. McDaniel claimed that this agreement was confirmed by his letter to appellee addressed to Mid-State Construction Company at Malvern, P. O. Box 104, to the attention of Evans. As abstracted by appellant, Clark's testimony included these statements:

> Our contractor contracted separately with Mid-State on the top soil because he wanted more money for select material and we had to separate it. Mid-State contracted to do the select material and to haul in the top soil. I mailed the letter, * * * I refer to the letter (Defendant's Exhibit No. 1) and my letter of December 19, 1969, because we considered the earlier letter the contract. * * * We didn't make any separation between fill dirt and top soil.

The first letter referred to was dated October 21, 1969, and stated the agreement as follows:

> * * * we have agreed on the estimated quantities of actual haul in fill.

> Yardage of haul in dirt; excluding topsoil to be installed in 6" lifts and compacted in accordance with

plans and specifications-47,367 yards at a unit price of One Dollar and Fifteen cents ($1.15) per cubic yard.

Haul in dirt topsoil to be dumped and fine graded-12,271 yards at a unit price of One Dollar and Twenty-Five Cents ($1.25) per cubic yard. * * *

I shall appreciate your beginning this haul in fill as soon as possible, and payments will be made on a percentage completed basis, in accordance with the contract between McDaniel Brothers Construction Company, and the Owners—the Housing Authority of the City of Malvern, Arkansas, with a ten percent (10%) retainage, until completed.

The unit prices shall include: grading and shaping of all street areas ready to receive base course gravel for the asphalt paving, compaction for fill under all building floor slabs, and line grading of the topsoil.

You mentioned the fact that it was not necessary that a contract be written. However, we are using this letter as a form of agreement and understanding, and thought it best to get this letter written as a matter of record of our agreement for this work.

The letter of December 19, 1969, made no mention of topsoil, but includes the following:

Our check is enclosed for the clearing sub-contract totaling $5,000.00 less 10% retainage, check net in the amount of $4,400.00.

* * *

Our sub-contract is in the mail to you for the lump sum amount of the haul-in dirt in accordance with your agreement with our Mr. Anderson and the writer.

I will be in Malvern one day next week and if you would like, we will evaluate the amount of dirt in place at that time and will bring the payments up to date for the material in place.

Clark denies having ever seen this first letter before the controversy arose. He testified that all Mid-State's mail was picked up at the company post office box to which he, a Mr. Cox and a Mr. Gibbs, but not Evans, had keys. On rebuttal, Clark said that when Evans' employment was terminated, he asked Evans to turn over everything in Evans' possession. He said that Evans expressed worry because he had nothing in writing from McDaniel.

Evans testified that he assumed that the parties entered into a contract. He believed that his first conversations were with Anderson. Evans acknowledged receipt of the letter of October 1, 1969, and stated that it contained his understanding of the agreement, but said that Mid-State had already started work before the letter came. He said that he picked up company mail a few times, but could only "guess" that someone let him have a key to get it out of the post office. He guessed that he discussed the contents of the letter with Clark. He stated that he did discuss selling topsoil with Clark, who told him to go ahead and make a deal and recalled discussing this item with Jones on several occasions. According to Evans the contract for the topsoil was made while Mid-State was already engaged in "filling the job." He was not at all clear about the stage the work had reached at that time. Evans reaffirmed his belief that "we" agreed to sell McDaniel Brothers topsoil, and was sure that he "was thinking" that the agreement was to take some strippings from across the river and haul them. He admitted that there was a possibility that Clark asked him during the last week of his employment with Mid-State if he had any papers or had made any contracts or had knowledge about anything of which he had not told Clark. He admitted a further possibility that Clark inquired about anything Evans had in connection with the Malvern Housing Au-

thority. Evans then stated that he left all company files and he believed he left all letters. He could not recall whether the letter of October 31, 1969, was left.

Jones recalled that Evans told him that Mid-State would put in fill dirt at $1.15 per yard and that if the topsoil on Mid-State's property was suitable to the Housing Authority, Mid-State would put it in for $1.25 per yard. Jones said that he did not negotiate the agreement on behalf of McDaniel, but that Evans said that the agreement as to topsoil was conditioned upon the suitability of the material to the Housing Authority. He remembered a conversation in the Sands Restaurant when, in the presence of Cox and Gibbs, Evans responded to Jones' request for a price for the topsoil by saying that he could not quote a price, but would have to talk to Clark about it. McDaniel said that Jones had the authority to buy certain material on a local site, but not fine grading on pads.

For some reason, McDaniel Brothers sent a copy of letter, dated October 21, 1969, which they contended stated the terms of the contract, to Mid-State along with a letter dated June 23, 1970.

We cannot say that there was no substantial evidence to support either party's contention as to the terms of the contract. Appellee contended and Clark testified that Evans had no authority to enter into contracts on behalf of Mid-State. Appellant argues that appellee ratified the acts of Evans. There seems to have been evidence to support such a theory, but we cannot say that the evidence was so clear as to eliminate any question of fact. We find no indication that this issue was raised by the pleadings or that it was otherwise asserted as an issue in the trial court. No instruction on this point was either given or requested.

We certainly cannot say that appellant would have been entitled to a directed verdict on this issue. Neither

can we say that the two interrogatories did not properly submit the issue or that they misled or tended to mislead the jury.

Passing to Point I, we cannot agree that there was no substantial evidence to support the jury award of $12,500 to appellee. In considering this evidence, we must view it in the light most favorable to appellee. The first work done by appellee was clearing and grubbing of the building sites, which included removing trees and stripping clay from the foundation sites and otherwise leveling them, for which Clark said appellee was to be paid $5,000. Clark estimated that appellee hauled in 58,000 cubic yards of fill dirt and compacted it to grade and specifications. On October 31, 1969, Mid-State billed McDaniel Bros. for 40,000 yards of material, without receiving any response. Another bill for $52,327.10 was rendered on December 10, 1969, after which appellant sent a check for $29,816.-28. Evans later picked up another check for $12,778, bringing appellant's total payments to $46,994.28, which included the amount agreed upon for clearing and grubbing less a 10% retainage. Clark said that this payment left appellant some $5,000 short on a $52,377 bill. This shortage apparently represented a 10% retainage. Clark admitted that all billings were based on estimates. Clark testified that on March 11, appellee billed appellant for a balance of $22,251.02, which seems to have been based on Clark's estimate that Mid-State's work was 95% complete. This contention was bitterly contested. Evans testified that he and Jones worked up most of the estimates on which Mid-State billed McDaniel. Evans said that he and Jones worked on the bill to McDaniel Brothers for $22,251.02, but that he was not sure that they were in complete agreement. Evans said that he calculated the bill on the basis of 95% completion. Jones admitted that he signed a statement that the contents of a letter from Clark, stating that appellee had hauled and compacted 55,761 cubic yards, were correct except as to an item of equipment rental and repair. On July 26, 1971, McDaniel wrote a letter to Mid-State asking confirmation of their balance with Mid-State at $18,866.50.

Doswell McDaniel estimated total yardage, including cut dirt, at 66,321 yards, which also included an estimated 12,271 cubic yards of topsoil. He admitted that the clearing and grubbing operations were satisfactorily carried out for the most part and that most of the performance by appellee was good up to the point where the bulk of the work had been completed and the need for small quantities was critical. He estimated the overall deficiency at 14% at that time but said that it later got worse. He claimed that appellant had to haul in 17,373 cubic yards to complete the job, only 12,500 of which should have been topsoil. McDaniel said that his company incurred expense amounting to $4,879.50 for equipment rental in completing the dirt haul. He said that they used their own dragline 240 hours which represented a cost of $4,800, a dirt crawler 470 hours, representing a cost of $4,700, and paid landowner royalties of $1,369 making a total of $13,500, from which he deducted $3,334, which he admitted would otherwise be due Mid-State. According to him, this left a balance due appellant by Mid-State of $10,215. Actually, McDaniel said that his company had hauled in an additional 1,906 yards of dirt and gave the contractors $760 for fine grading.

McDaniel calculated that Mid-State had hauled 44,-392 yards by June 23, 1970. He admitted that the ground was irregular, that the best estimate by survey was not accurate, and that more than the original estimated yardage was hauled in before the job was complete. Appellant had tendered appellee a check for the amount eventually deducted from the total that appellant credited against the counterclaim. He excused the use of the street areas for stacking materials by saying that the streets should have been graded before the materials were delivered. He also confessed that he had written a letter to Mid-State in which he stated that he was aware that the work could not have been done due to weather conditions.

Clark admitted that his billings were based upon rough estimates of percentage of completion made by him and

Evans. Appellee had employed engineers to estimate the total yardage when the job was commenced, and Clark and Evans kept truckload accounts at first. Clark said that, contrary to appellant's contention, Mid-State's forces stood ready to complete the job and all delays were attributable either to weather conditions or interference with street shaping and grading by appellant's using these areas as a site for unloading building materials.

Donald Brady, an engineer employed by appellee, estimated the total fill dirt to be hauled in to bring the sites to finished grade, including topsoil, was 58,700 yards. Brady said that his estimate was somewhat lower than McDaniel's which was 67,000 yards but did not take into consideration a 3,000-yard cut on one site. He seemed to think that this might account for a part of the difference in the two estimates.

Appellant argues that the only basis for arriving at a verdict would be as follows:

| | |
|---|---:|
| Brady's estimated yardage | 58,700 |
| Less McDaniel's record of yardage hauled by appellant | 17,400 |
| | 41,300 |
| 41,300 yards at $1.15 | $ 47,495.00 |
| Less payments made | 46,994.28 |
| | $ 501.62 |

Even if the $5,000 for clearing and grubbing were added and nothing was allowed on the counterclaim, the verdict would obviously be excessive if the jury had no other basis for its verdict.

On the other hand, the jury might have taken a different approach. It might have felt that Clark's estimate of 58,000 yards was supported by other testimony, such as: McDaniel's estimate of total yardage of 66,321, less 12,271 yards of topsoil, leaving a possible 54,050 yards, which was subject to adjustment because the irregular terrain

made accurate estimation difficult; and Jones' confirmation of an estimate of 55,761 yards placed on the job sites. This could have resulted in the following verdict:

| | |
|---|---:|
| 58,000 yards at $1.15 | $ 66,700.00 |
| Clearing and grubbing | 5.000.00 |
| Total | 71,700.00 |
| | |
| Payments made | 46.994.28 |
| Balance due | $ 28,705.72 |

If the jury did so view the matter, there was considerable latitude for allowance of expenditures by appellant in completing the contract, without reducing the balance below $12,500. There was also considerable dispute about whether Mid-State owed McDaniel for rental on a piece of equipment.

Of course, the jury was not required to fully accept the testimony of either Clark or McDaniel on any feature of the case, or to credit Brady's testimony to the exclusion of other evidence. Since there was substantial evidence to support a larger verdict, we cannot say that there was no substantial support for this verdict. See *Fulbright* v. *Phipps,* 176 Ark. 356, 3 S. W. 2d 49.

Appellant's Point III related to appellee's requested instruction No. 4 to the effect that an offer, which introduces a new term into a transaction, constitutes either a counter-proposal or an offer to treat but not an agreement. The objection made in the trial court was that the instruction was immaterial because there was no evidence that there was any counter-proposal subsequent to the formation of the contract. Even if it be said that Evans had authority to contract on behalf of appellee or that his unauthorized acts were ratified by his employer, still there was evidence that the discussions about topsoil did not arise until after appellee's work on the job had commenced, that it was, at best, a conditional agreement or offer, and that appellant decided it did not want to use appellee's material after three or four loads were hauled. We cannot say that the instruction was erroneous for the reason assigned.

On cross-appeal, Mid State asserts two alleged errors. One of them is that the jury was confused by the court's interrogatory No. 8, which read:

> On the basis of your answer to the above interrogatories what is the amount of damages the plaintiff is entitled to?

Appellee argues that the word "damages" was misleading to the jury because it sought recovery on a quantum meruit basis. Although the wording may not have been technically correct, after reviewing the instructions given and the other interrogatories, we do not see how the jury could have been misled.

The other point on cross-appeal has to do with the court's failure to give AMI 101 after having indicated to the attorneys for the parties that it would do so. We have previously said that it is the better practice for the court to give this instruction when requested or recite into the record the reasons for not giving it in the unusually exceptional cases when a refusal to give it is justified. *Smith v. Alexander,* 245 Ark. 567, 433 S. W. 2d 157. The circuit judge's comments were that the instruction was a long one, relating to the duties of the court, the jury and the attorneys, that he had read it to them many times, that he didn't think it necessary that he read it again, unless the jurors wanted him to. Of course, if the instruction had been read to all the jurors on numerous occasions, the failure to repeat it might be justified. Appellee says, however, that only two other cases had been tried while the particular jury panel was serving, that three members of the jury had been members of the jury in only one case, and that six members had not been jurors in either. Appellee admits that we cannot act on this information from outside the record. For that reason and because the objection of appellee to the failure to give the instruction was not on this basis, and could not have been a ground of a motion for new trial on which these matters could have been brought into the record, we are unable to say that there was reversible error in this case, just as we were in *Smith v. Alexander,* supra.

The judgment is affirmed.